**UNITED STATES of America, Plaintiff,**

v.

**Jack Roy CLAYTON, Defendant.**

**Nos. 20278, 20282.**

United States District Court W. D. Missouri, W. D.

Nov. 9, 1960.

Edward L. Scheufler, U. S. Atty., O. J. Taylor, Asst. U. S. Atty., Kansas City, Mo., for plaintiff.

George V. Aylward, Jr., Kansas City, Mo., for defendant.

RIDGE, District Judge.

Respondent has complied with the memorandum order issued by this Court under date of October 26, 1960.

It now appears from the files and records in this case that there is no factual basis for any issue premised in the proposition that defendant was mentally incompetent at the time he entered pleas of guilty to the several charges made against defendant in the several counts of the indictment in each of these cases.

The record reveals that defendant was sentenced by this Court on October 24, 1958. Under his commitment to the custody of the Attorney General of the United States, he was first lodged in the United States Penitentiary at Leavenworth, Kansas. On January 9, 1959, defendant was given a psychiatric examination by the Staff Psychologist and Neuropsychiatric Board of that institution. On that date he was certified as psychotic and his transfer to the Medical Center for Federal Prisoners, at Springfield, Missouri, was thereafter recommended as provided in Section 4241, Title 18 U.S. C.A. While it was the opinion of the Neuropsychiatric Board of Leavenworth Penitentiary that defendant, on January 9, 1959, did show an acute psychosis, it was the Board's further opinion that there was no reason to believe that the defendant was mentally incompetent to stand trial on the charges made against him in this Court.

On his transfer to the Medical Center for Federal Prisoners, at Springfield, Missouri, another psychiatric examination was made of defendant, on April 29, 1959. The Staff Psychiatrist who then examined petitioner had before him a copy of the pre-sentence investigation report used by this Court in the sentencing of defendant. Seemingly the defendant attributed the mental illness from which

he was then suffering to events which happened while confined in jail awaiting transfer to Leavenworth Penitentiary. This, manifestly, was subsequent to his appearance in this Court, at time of sentence.

The diagnosis made of defendant on April 29, 1959, was that of "schizophrenic reaction, acute undifferentiated type, in the process of remitting," etc. It was noted by the Staff Psychiatrists that the question of defendant's mental illness was apparently not considered at the time of his trial. That is true: No question was ever raised before this Court at the time of the entry of defendant's pleas of guilty and sentence, in respect to any mental illness of defendant that would militate against such a plea and sentence being imposed upon him thereunder.

At the annual review of defendant's mental illness on May 18, 1960, by the Neuropsychiatric Staff of the Medical Center for Federal Prisoners, at Springfield, Missouri, the Staff was of the opinion that "the presence of a mental illness of psychotic degree observed in this man (defendant) during the period of his treatment at Leavenworth and at the Medical Center, and information about his behavior in jail indicates the probability that Clayton was mentally ill at the time of trial and sentence." As a consequence of such conclusion, the Psychiatric Staff expressed the opinion that there is probable cause to believe that defendant was not able to consult with his lawyer with a reasonable degree of rational understanding, nor did he have a rational, as well as a factual, understanding of the proceedings against him, and recommended to the Director of the Bureau of Prisons that a certificate be issued in accordance with Section 4245, Title 18, U.S.C. The record establishes that the Director of the Bureau of Prisons reviewed such recommendation of the Psychiatric Staff of the Medical Center. On June 24, 1960, the Director noted the conflict between the findings of the Neuropsychiatric Board of Leavenworth Penitentiary, as made on January 9, 1959, to the effect that defendant was not men-

tally incompetent to stand trial; and, that made by the Neuropsychiatric Staff of the Medical Center, on April 27, 1960, and called for a clarification of the apparent contradiction between the findings of such staffs, because, upon the facts before him he did not believe he could make a certificate under Section 4245, as the record then stood. On June 29, 1960, the Director of the Bureau of Prisons was informed by respondent that the Staff of the Medical Center, in submitting its progress report as of May 18, 1960, recognized the discrepancy between its opinion and that of the Examiners at Leavenworth Penitentiary, and that on the basis of the record they agreed that the Director of the Bureau of Prisons could not make a certification under Section 4245.

Although the Neuropsychiatric Board of Leavenworth Penitentiary and the Neuropsychiatric Staff of the Medical Center for Federal Prisoners, at Springfield, Missouri, had before it a copy of the pre-sentence investigation which this Court used in the sentence of defendant, they did not have a copy of the transcript of the record as made by this Court at the time of sentence. As above stated, no question was raised before this Court as to any mental illness resident in defendant at the time he was sentenced by this Court. He was represented by counsel of his own choice who made a protracted appeal to the Court for mercy and leniency. For the sake of brevity, we shall not include herein the full transcript of proceedings had at the time of defendant's sentence by this Court. The same is on file as a part of the record in defendant's case. It is sufficient to say that, after counsel for defendant's plea for the mercy of the Court, and leniency, the Court made certain observations gleaned from the pre-sentence investigation, to the effect that the defendant entered into the business of selling narcotics for a period of five (5) years, with no other motive than that of gain; that he engaged in the sale of large quantities of narcotics throughout the southern states; that he had refused to disclose where he obtained the narcotics; that the pre-sen-

tence investigation established a deliberate, considered pattern on the part of defendant to engage in the selling of narcotics and that he was an important dealer in narcotics, working out of this community. The Court briefly reviewed his previous record of arrests. Before doing so, however, the Court inquired of defendant: "Is there anything you want to say, Mr. Clayton, to the Court before sentence is passed in this case? The Defendant: No, Sir." But, after so reviewing defendant's record, the following transpired in open court:

"THE DEFENDANT: Judge, if I might say one word. The people that use these narcotics, they would have obtained the narcotics, they were obtaining the narcotics from any source possible. There is a misconception about an addict. These people carried on their business, they didn't go out and commit any crimes. In other words, most of these people conducted a normal business. An addict—well, it seemed like the conception of an addict of the people on the street is a wild-eyed, screaming monster.

"I am sure if you would check the record you would find that one of these persons, probably 75 or 76 years old, had been addicted for 50 years, carries on a legitimate business.

"Now, these people didn't take narcotics for excitement or for a boost, but to maintain an equilibrium, they did carry on their business.

"The first person I sold narcotics to had a very real physical problem, a man in this town. I had compassion for these people. I think if you talked with the people—as to the amount, it has been blown up. I don't know—this one person in particular, Mr. Anthony, off and on I sold to him for the longest, and I told him half a dozen times if he would quit and leave me alone I would quit. I didn't go out soliciting. Most of these people had this problem, they were acquainted with one another, they were always worried about being blackmailed by someone or other, and I treated those people fair.

"I know I violated the law, but it isn't quite like as might be stated in that paper—I didn't—I could have blackmailed those people, robbed those people in any way I wanted to. I realized their physical problem; and I don't know if you know an addict one way or another, but they have a very physical and very real problem. There is something wrong with the laws, the Government, that after a person is addicted he will be addicted the rest of his life.

"Now, these people that we have been dealing with, they are still going to try to obtain narcotics by various means. They have a physical problem.

"Now as far as the money I made, I will take this under a lie detector, or anything else, it is absolutely untrue, the agents I am sure found out; I will take a lie detector test, any questions with regard to the amounts or the money involved.

"I merely wanted to bring out that point. These people have that problem. Well, I don't feel like I was hurting those people. To the contrary, I thought I was—you talk about the ounce, the biggest fear was not being able to carry on from week to week, and take a trip, or something or other, and the ounce was—well, it would be like you having food in your icebox, is about what it amounted to, only more so. I don't think a one of those people ever suffered from any narcotic that I sold them. To the contrary, I kept them off the street, because an addict will obtain it in some manner or other.

"I am not trying to say that I am a humanitarian, or anything else, but I did have a certain compassion for these people, and I think any one of them will tell you that, particu-

larly this one that I dealt with longest. Half a dozen times I tried to get the fellow to leave me alone and quit, and I think possibly he would tell you the same thing.

"As far as the amount of money concerned, that is not true. If you believe in the lie detector test, or anyone else does, I will take that. I am an introvert, I live more or less to myself out there. There have been a lot of rumors, a lot of things said that—well I don't understand where they even come from.

"Since I have a family—I got into this business just before my first child was born—well, it has been on my mind a lot more probably than you think. As far as the monetary gain, if I had been working out here for the Gas Company, digging ditches, I would be just as far ahead, because I am in debt right now.

"THE COURT: Had you been working for the Gas Company, digging ditches, you wouldn't be in violation of the law, as you are standing here now.

"THE DEFENDANT: That is true."

The rationalization of defendant which induced him, so he says, to commit the offenses for which he was charged, clearly establishes the reasoning of an amoral mind, but, seemingly, not then psychotic, so as to establish mental incompetency, not mental illness, that would militate against defendant's ability to enter a plea of guilty in this Court and receive sentence thereon. It may establish a psychopathic personality, with antisocial trends, but such a conclusion does not establish mental incompetency from a legal standpoint.

Absent a certification by the Director of the Bureau of Prisons as provided in Section 4245, Title 18 United States Code, there is nothing in the record now before this Court to establish that defendant was in anywise mentally incompetent at the time of the entry of his plea of guilty and sentence thereon. Therefore, defendant's motion under Section 2255, Title 28 United States Code, must be, and the same is, by the Court overruled.

IT IS SO ORDERED.